UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH MARIANO,<br><br>                Plaintiff,<br>v.<br><br>UNITED PARCEL SERVICE, INC.;<br>CHUCK HANKS; NICK GERACHI;<br>DOES 1-50,<br><br>                Defendants. | Case No. 3:13-cv-0776-GPC-JMA<br><br>**ORDER GRANTING MOTION TO REMAND**<br><br>**(ECF NO. 8)** |

## INTRODUCTION

Before the Court in this employment discrimination and harassment case is Plaintiff's Motion to Remand ("Motion"). (ECF No. 8.) Defendant United Parcel Service, Inc. ("UPS") has filed an opposition to Plaintiff's Motion, (ECF No. 11), and Plaintiff has filed a reply, (ECF No. 12). The Court deems Plaintiff's Motion suitable for disposition without oral argument. *See* CivLR 7.1.d.1. Having reviewed the parties' submission and the relevant law, and for the reasons that follow, the Court will **GRANT** Plaintiff's Motion because UPS has not satisfied its burden of demonstrating this Court has subject matter jurisdiction over this case.

## PROCEDURAL BACKGROUND

On June 17, 2013, Plaintiff, a citizen of California, filed suit in the San Diego

Superior Court against defendants UPS, Chuck Hanks ("Hanks"), and Nick Gerache (erroneously sued as Nick Gerachi) ("Gerache"), asserting ten causes of action for (1) Violation of California Labor Code § 1102.5; (2) Wrongful Termination in Violation of Public Policy; (3) Constructive Discharge in Violation of Public Policy; (4) Retaliation in Violation of California Government Code § 12940(h); (5) Disparate Treatment in Violation of California Government Code § 12940(a); (6) Age Discrimination in Violation of California Government Code § 12940(a); (7) Hostile Work Environment Harassment in Violation of California Government Code § 12940(j); (8) False Imprisonment; (9) Fraud; and (10) Unfair Competition in Violation of California Business and Professions Code § 17200 et seq.[1]

UPS thereafter removed the action to this Court, asserting diversity jurisdiction. (ECF No. 1.) Hanks and Gerache joined in the removal. With regard to the fact that Plaintiff has asserted claims against Hanks and Gerache, both citizens of California, UPS asserts Hanks and Gerache are sham defendants and that the Court should therefore ignore their citizenship in determining whether the Court has diversity jurisdiction over this case. Plaintiff thereafter filed the instant Motion to Remand. (ECF No. 8.)

## **PLAINTIFF'S ALLEGATIONS**

Plaintiff alleges UPS hired him in 1989. (ECF No. 1-2, Compl. ¶ 6.) Plaintiff states that, over the course of his employment, he was promoted several times, received numerous salary increases, received excellent performance reviews, and did not receive a single write up for twenty-two years. (*Id.*) In addition to being a delivery driver, Plaintiff also served as "Safety Board Co-Chair," which included training drivers and employees about proper safety protocols in the workplace, workplace hazards, and workers rights. (*Id.* ¶¶ 7, 8.)

As a driver, Plaintiff's assigned delivery route included the U.S. Department of Veteran's Affairs Regional Adminstration Building ("VA Building") in San Diego.

---

[1] San Diego Superior Court case number 37-2013-30625-CU-WT-CTL.

(*Id.* ¶ 9.) In late 2009, the VA Building underwent remodeling through the area where Plaintiff delivered packages. (*Id.* ¶ 10.) As such, the VA Building required Plaintiff to deliver packages using a "handicap only" access ramp. (*Id.*) Plaintiff alleges "[d]elivery via this . . . ramp presented a particularly unsafe working condition that created a real and apparent hazard to [Plaintiff], the general public, and disabled individuals at the VA Building." (*Id.* ¶ 11.) Plaintiff elaborates that he was required "to push a 300 pound, full handcart up a narrow handicap marked walk path about forty five yards uphill while making two ninety degree turns." (*Id.*) Plaintiff continues, "Once embarking up the ramp, [Plaintiff] could not see individuals walking down, or proceeding down on wheelchairs. Also, wheelchairs could not pass [Plaintiff] due to the narrowness of the ramp." (*Id.*) Thus, "if an individual in a wheelchair was going down the ramp, [Plaintiff] had to retreat backwards, blindly and downhill, through two ninety degree turns to allow the wheelchair to continue through." (*Id.*) Plaintiff alleges "the ramp's uphill incline made it difficult to stop when going up and down," and that "[t]he ramp was particularly dangerous and slippery when wet, as it often was due to the sprinklers and shading overhead." (*Id.*)

Plaintiff alleges he "immediately reported the dangerous condition to HANKS [Plaintiff's immediate supervisor] and requested that UPS agents take action to correct the hazard. (*Id.* ¶¶ 12, 18.) Plaintiff alleges he "emphasized the immediate need for an alternate delivery route due to the real and apparent danger to himself, the public, and the disabled individuals at the Veteran's building who used the ramp." (*Id.*) Plaintiff claims Hanks acknowledged Plaintiff's complaint but took no action to correct or change the dangerous condition. (*Id.*)

Plaintiff alleges that, "[a]fter HANKS continued to take no action regarding the dangerous condition, [Plaintiff] reported the dangerous condition to Business Manager FILCORN and again requested UPS agents take actions to correct the hazard." (*Id.* ¶ 13.) Plaintiff alleges Filcorn "suggested an alternate, but far more dangerous delivery route" that "required [Plaintiff] to park his truck half on the road, half on the curb, on

a street where cars typically drive 60 mph." (*Id.*)

Plaintiff asserts that, "[a]fter FILCORN continued to take no action regarding the dangerous condition, [Plaintiff] went to Safety Manger ESQUIVEL," who agreed the handicap ramp was dangerous and that action needed to be taken to correct the dangerous condition. (*Id.* ¶ 14.) Plaintiff claims Esquival further agreed Filcorn's proposed alternative route was even more dangerous than the handicap ramp. (*Id.*) Plaintiff alleges Esquival, in turn, reported the condition to Division Manger Brown. (*Id.*) Plaintiff claims Brown responded by telling Plaintiff to "stop complaining" and to "just do [his] job." (*Id.* ¶ 15.)

Plaintiff further alleges that Hanks was "enraged" by Plaintiff's choice to report the dangerous condition to upper management. (*Id.* ¶ 16.) Plaintiff claims Hanks therefore became hostile toward Plaintiff. (*Id.*)

Plaintiff alleges he continued to complain to Hanks about the dangerous condition, but that Hanks echoed Brown's advice to "stop complaining" and to "just do [his] job." (*Id.* ¶ 17.) Plaintiff also alleges Hanks told him that any actions were "corporate decisions and not for [Hanks] to make." (*Id.*) Plaintiff claims Hanks grew increasing annoyed with Plaintiff's constant complaints about the unsafe delivery. (*Id.*)

Plaintiff claims that, on or about March 8, 2011, it was pouring rain in San Diego and that, when he arrived at the VA Building, he concluded the delivery was far too dangerous to complete. (*Id.* ¶ 18.) Plaintiff states he called Hanks and that Hanks agreed the delivery was too dangerous. (*Id.*) Plaintiff claims Hanks sent a text message to Plaintiff, telling Plaintiff "not to deliver the packages and to enter code 'NI1' into his DIAD ('delivery info gathering device'), which meant 'client was not in.'" (*Id.*) Plaintiff took a snapshot of Hank's text message and, on Hank's advice, did not deliver packages on March 8, 2011. (*Id.*) Plaintiff states he immediately told Filcorn he did not deliver the packages because it was too dangerous. (*Id.* ¶ 19.)

Plaintiff alleges that, on or about March 9, 2011, loss prevention supervisor Gerache ushered Plaintiff into a small office, closed the door, and yelled at him,

demanding an explanation for the undelivered packages. (*Id.* ¶ 20.) Plaintiff states he explained to Gerache that Hanks instructed Plaintiff to not deliver the packages and to enter the "NI1" code, and Plaintiff showed Gerache the text message from Hanks reflecting as much. (*Id.*) Plaintiff thus claims Gerache wrongly accused him of being dishonest and that Gerache concluded the interrogation by instructing Plaintiff to not discuss the meeting with anyone. (*Id.*)

Plaintiff asserts that, on or about March 10, 2011, Hanks was suspended for over two weeks for instructing Plaintiff to not deliver the packages. (*Id.* ¶ 21.) Plaintiff claims that, immediately upon Hank's return, Hanks "embarked upon a thirteen month stint of harassment, discrimination, retaliation and hostility toward [Plaintiff] because [Plaintiff] had, as HANKS complained to other employees 'ratted him out.'" (*Id.* ¶ 22.) Plaintiff claims "[t]his treatment concluded in [Plaintiff's] termination." (*Id.*)

More specifically, Plaintiff alleges Hanks "continually shunned [Plaintiff] around other employees, belittled [Plaintiff's] job, reprimanded [Plaintiff] in front of [Plaintiff's] co-workers and blatantly ignored [Plaintiff's] requests for help." Plaintiff asserts Hanks "also made these comments, and treated [Plaintiff] poorly because of [Plaintiff's] age." (*Id.*) Plaintiff states he turned 40 years old on March 4, 2010. (*Id.* ¶ 6.)

Plaintiff further claims, "every time [Plaintiff], pursuant to his job as Safety Board Co-Chair, reported unsafe conditions, or reported the dangerousness of the VA Building deliveries, HANKS would roll his eyes and make comments including, "is [Plaintiff] complaining again?"; "why can't you just do your job?"; "who did you piss off on route today?"; and "why can't you just do what we want you to do?" (*Id.* ¶ 24.)

Plaintiff alleges Hanks "began to wrongly accuse [Plaintiff] of not delivering his Next Day Air on time and of going off route when not allowed." (*Id.* ¶ 25.) Plaintiff further claims Hanks "prepared false disciplinary write ups to 'paper' [Plaintiff's] personnel file." (*Id.*)

Plaintiff claims that, on May 11, 2012, around 2:50 p.m., while he was on route,

he received a call from Hanks. (*Id.* ¶ 26.) Plaintiff states that Hanks then met Plaintiff and drove him to the El Cajon Center. (*Id.*) Plaintiff asserts that, upon his arrival, Hanks immediately ushered Plaintiff to a small security office where Gerache and a union steward, Butch Young, was waiting for him. (*Id.*) Plaintiff claims Gerache then "proceeded to wrongly accuse [Plaintiff] of theft, dishonesty, of having a side business on his route and for selling drugs." (*Id.*) Plaintiff alleges he was "[s]hocked by these absurd and outrageous allegations," and that he "explained that none of the allegations were in any way true." (*Id.*) Plaintiff claims he "was detained in the small security office for multiple hours under the direction and power of UPS Supervisors." (*Id.*) Plaintiff further claims that he "told them he had not eaten all day and was starving," but that Gerache "refused to let him eat." (*Id.*) Plaintiff claims he "was held in confinement in the small secluded security office, during work hours, against his will, under the direction and power of the Loss Prevention Supervisor GERACHI and YOUNG for almost four hours." (*Id.* ¶ 27.)

Plaintiff asserts that, "[a]s a direct result of the extended detention, and coercion including threats of arrest from GERACHI and HANKS, threats that they had pcitures to prove the allegations (although these pictures were never produced) [Plaintiff] was driven to a place of despair, did not feel free to leave for fear of losing his job, and felt confined in his movement." (*Id.* ¶ 28.) Plaintiff claims Gerache "continued to state, 'UPS has a large file on you and maybe UPS could offer you a chance to resign,'" and that Young "continually asked, over and over again, 'Are you OK with your wife picking you up from jail?'" (*Id.*) Plaintiff asserts the threats of arrest and loss of his job ultimately coerced him into a false confession. (*Id.* ¶ 29.)

Plaintiff asserts the threats of arrest and loss of his job made him feel that he had no reasonable means of escaping detention. (*Id.* ¶ 30.) Plaintiff asserts that, "[a]fter 2 hours of detention he was starving, unable to focus or make sense of what was happening, his blood sugar was low and he felt faint." (*Id.* ¶ 32.) Plaintiff claims "[h]is mental and physical state was readily apparent to both GERACHI and YOUNG."

(*Id.*) Plaintiff thus claims "UPS utilized physical and psychological tactics to intimidate, threaten, harass, and coerce [Plaintiff] into remaining at the mercy of the empowered UPS personnel and, ultimately submissively giving into a coerced confession which contained information that was not true but was information [Plaintiff] was compelled to write at the instruction of GERACHI and YOUNG." (*Id.* ¶ 33.) Plaintiff alleges Gerache and Young "forced [Plaintiff] to confess to 'dishonesty.'" (*Id.*)

Plaintiff further alleges Gerache and Young "made promises to [Plaintiff] as to one or more material matters, including the promise that he would keep his job if he confessed." (*Id.* ¶ 34.) Plaintiff claims Gerache and Young knew, at the time, that their promises were false and that they did not intend on keeping them. (*Id.*) Plaintiff further claims Young told Plaintiff "he should resign and admit guilt because 'everything would be ok and you will receive due process in this matter from the union. Don't worry.'" (*Id.*) Plaintiff claims that Young reminded Plaintiff "that the alternative would mean that his wife would have to pick him up from jail." (*Id.*) Plaintiff further claims Gerache "communicated that UPS would be more lenient on an accused employee if he confessed, which leniency meant that the matter would be 'kept in house' and that the policy would not have to get involved." (*Id.*)

Plaintiff asserts he "was not aware of Defendants' intention not to perform the promises, . . . [that he] acted in reliance upon those promises[, and that he] . . . was justified in relying on the promises." (*Id.* ¶ 35.) Plaintiff claims Defendants "made such promises with intent to defraud [Plaintiff]; that is, they made the promise[s] for the purpose of inducing [Plaintiff] to rely upon them and to act, or refrain from acting, in reliance upon them." (*Id.* ¶ 36.)

Plaintiff claims "[s]aid retaliation, discrimination, harassment, hostility, interrogation and false imprisonment ultimately concluded with the termination of [Plaintiff's] employment on May 1, 2012." (*Id.* ¶ 37.) Plaintiff states he "was 42 years old at the time of his termination." (*Id.* ¶ 38.)

# DISCUSSION

## I.  Legal Standard

"Only state court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); 28 U.S.C. § 1441(a). Removal is governed by 28 U.S.C. § 1441 et seq. The removal statutes are to be "strictly construe[d] . . . against removal jurisdiction," and the removing party "always has the burden of establishing that removal was proper." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Id.*

"[J]urisdiction founded on [diversity] requires that parties be in complete diversity and the amount in controversy exceed $75,000." *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003); 28 U.S.C. § 1332(a)(1). Complete diversity requires that the plaintiff's citizenship is diverse from that of each named defendant. 28 U.S.C. §§ 1332(a)(1), 1332(c)(1); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 n.3 (1996).

A district court may disregard a non-diverse party named in the state court complaint and retain federal jurisdiction if the non-diverse party is joined as a sham defendant or if the joinder is fraudulent. *McCabe v. Gen. Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir.1987). The term "fraudulent joinder" is a term of art that is used for removal purposes, and does not connote any intent to deceive on the part of plaintiff or his counsel. *Lewis v. Time, Inc.*, 83 F.R.D. 455, 460 (E.D. Cal. 1929), *aff'd*, 710 F.2d 549 (9th Cir. 1983). Joinder is deemed fraudulent if the plaintiff fails to state a cause of action against the non-diverse defendant, and that "failure is obvious according to the settled rules of the state." *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir.1998) (quoting *McCabe*, 811 F.2d at 1339). This requires the court to determine whether there is any possibility that the plaintiff will be able to establish a cause of action against the non-diverse defendant in state court. *Briano v. Conseco Life*

*Ins. Co.*, 126 F. Supp. 2d 1293, 1296 (C.D. Cal. 2000); *Hunter v. Phillip Morris*, 582 F.3d 1039, 1044-46 (9th Cir.2009).

In making this determination, "[t]he court's job is not to determine whether the plaintiff will actually or even probably prevail on [the] merits of his claim, but rather to evaluate whether there is any possibility plaintiff may do so." *Archuleta v. Am. Airlines, Inc.*, 2000 WL 656808, at *4 (C.D.Cal. May 12, 2000). Thus, a non-diverse defendant is only deemed a sham defendant if, after all disputed questions of fact and ambiguities of law are resolved in the plaintiff's favor, the plaintiff could not possibly recover against the party whose joinder is questioned. *See Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1426 (9th Cir.1989); *Bear Valley Family, L.P. v. Bank Midwest, N.A.*, 2010 WL 3369600, at *2 (C.D. Cal. Aug. 23, 2010) (stating that courts generally disfavor the doctrine of fraudulent joinder, and any ambiguity of law or fact must be resolved in favor of remand).

The removing party bears the burden of proving a defendant has been fraudulently joined "by clear and convincing evidence." *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007); *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 807 (N.D. Cal. 1998) ("[T]he defendant must demonstrate that there is no possibility that the plaintiff will be able to establish a cause of action in state court against the alleged sham defendant."); *Burris v. AT & T Wireless, Inc.*, 2006 WL 2038040, at *2 (N.D.Cal.2006) (stating that remand must be granted unless the defendant shows that the plaintiff "would not be afforded leave to amend his complaint to cure [the] purported deficiency").

**II.    Analysis**

Plaintiff asserts his Seventh Cause of Action [Hostile Work Environment (Cal. Gov. Code § 12940(j)] against UPS and Hanks; his Eighth Cause of Action (False Imprisonment) against UPS, Hanks, Gerache, and Young; and his Ninth Cause of Action (Fraud) against UPS, Hanks, Gerache, and Young.

UPS asserts Hanks and Gerache are sham defendants because, under the

"managerial immunity" doctrine, Hanks and Gerache cannot be held liable for false imprisonment or fraud. UPS asserts Plaintiff's allegations in support of his false imprisonment and fraud claims "are merely a creative effort to avoid" the "managerial immunity" doctrine. UPS argues Plaintiffs false imprisonment and fraud claims are indistinguishable from his retaliation and wrongful termination claims. UPS asserts "Plaintiff's claims arise out of interrogations that were conducted as part of [Hank's and Gerache's] duties to interrogate potential theft and employee misconduct," and that Plaintiff is erroneously "attempt[ing] to analogize false imprisonment to harassment." In short, UPS asserts Plaintiff may assert claims for false imprisonment and fraud only against UPS, not Plaintiff's former supervisors, Hanks and Gerache.

In support of its position, UPS relies primarily on three California cases. The first is *Reno v. Baird*, 18 Cal. 4th 640 (1998), in which the California Supreme Court held that an employee could not sue her individual supervisor for discrimination under California's Fair Employment and Housing Act ("FEHA") or for wrongful discharge in violation of public policy, as both causes of action may only be asserted against the employer. The second is *Jones v. Lodge at Torrey Pines Partnership*, 42 Cal. 4th 1158 (2008), in which the California Supreme Court extended its holding in *Reno* to further preclude employees from asserting FEHA retaliation claims against individual supervisors. The third is *Janken v. GM Hughes Electronics*, 46 Cal. App. 4th 55 (1996), in which the California Court of Appeal held that an employee may not sue an individual supervisor for discrimination under FEHA where the supervisor's conduct entails the making of personnel management decisions necessary to the supervisor's job performance but that an employee could sue an individual supervisor for harassment under California Government Code § 12940(h).

UPS further argues Plaintiff's fraud claim is barred by workers compensation preemption because Hank's and Gerache's allegedly fraudulent statements "were made during an interrogation for employee theft, which is considered a normal part of the employment relationship."

UPS lastly argues Plaintiff's attempt to assert a claim for harassment against Hanks fails as a matter of law because Plaintiff was not disabled or associated with the disabled. UPS asserts that, in fact, "Plaintiff does not allege he was a member of any protected class." UPS further asserts that Plaintiff's allegation that he was advocating on behalf of disabled veterans at the VA Building does not suffice to state a claim for associational discrimination under FEHA.

Plaintiff argues that, while Hanks and Gerache may not be held personally liable for discrimination and retaliation, they may be held personally liable for the torts of false imprisonment and fraud. Plaintiff asserts there is no such thing as a "managerial immunity" doctrine that would bar Plaintiff's claims as a matter of law but that, instead, a "managerial privilege" may be asserted as an affirmative defense in some instances. Plaintiff asserts the privilege cannot be used to establish that Hanks and Gerache are sham defendants for four reasons: (1) the scope and availability of the privilege is unsettled under state law; (2) the cases relied on by UPS are based on the statutory language of FEHA and not the common law torts that Plaintiff alleges; (3) the Court should not consider affirmative defenses in determining whether joinder was fraudulent; and (4) on the merits, Hank's and Gerache's alleged conduct was not within the scope of their supervisory duties.

In support of his argument that the managerial privilege is unsettled under California law, Plaintiff relies on three cases. The first is *Huynh v. Vu*, 111 Cal. App. 4th 1183, 1194 (2003), in which the California Court of Appeal recognized "[t]he scope of the manager's privilege . . . is neither clear nor consistent." The second is *Graw v. Los Angeles County Metropolitan Transportation Authority*, 52 F. Supp. 2d 1152, 1155 (C.D. Cal. 1999), in which the district court recognized "there is no consensus of California decisions" on the issue of whether the privilege applies where the manager does not act for the benefit of the company. The third is *Hernandez v. Ignite Restaurant Group, Inc.*, 2013 WL 129286, at *4 (E.D. Cal. Jan. 9, 2013), recognizing "it is not clear whether the manager's privilege applies outside the scope

of claims for intentional interference with contract."

Here, the Court first notes that it agrees with Plaintiff's observation that no California court has recognized a "managerial immunity" doctrine. The Court further agrees California law is unsettled with regard to whether the managerial privilege would bar Plaintiff's tort claims against Hanks and Gerache. The Court disagrees with UPS that *Reno*, *Jones*, and *Janken* bar Plaintiff's tort claims as a matter of law. These cases interpreted and applied the statutory language of FEHA and did not directly address whether an individual supervisor was protected from suit based on the managerial privilege. At most, those cases stand for the proposition that Plaintiff may not sue Hanks and Gerache individually for wrongful termination or retaliation. And, indeed, Plaintiff has not asserted his claims for wrongful termination and retaliation against Hanks or Gerache. He has asserted claims for false imprisonment and fraud against Hanks and Gerach, and UPS does not attempt to argue that, without the managerial privilege, these claims fail as a matter of law. Further, *Janken* also stands for the proposition that Hanks and Gerache may be personally liable for harassment. While UPS attacks the sufficiency of Plaintiff's associational harassment claim, UPS has not demonstrated Plaintiff's claim cannot be cured by amendment. Because the Court finds that California law is unsettled with regard to the scope and application of the managerial privilege, the Court need not address the parties' remaining arguments.

Resolving all disputed questions of fact and ambiguities of law in Plaintiff's favor, the Court concludes UPS has not shown, by clear and convincing evidence, that there is *no possibility* that Hanks and Gerache may be held liable for their allegedly tortious conduct. As such, the Court cannot find Hanks and Gerache are sham defendants. Thus, the complete diversity does not exist for purposes of establishing diversity jurisdiction, and the Court therefore lacks subject matter jurisdiction. Accordingly, the Court must grant Plaintiff's Motion to Remand.

## **CONCLUSION**

After a careful consideration of the parties' submissions and the applicable law,

and for the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion to Remand is **GRANTED**. The Clerk of Court is therefore directed to **REMAND** this case to the San Diego Superior Court. The hearing on Plaintiff's Motion to Remand, currently set for July 26, 2013, is **VACATED**.

DATED: July 18, 2013

HON. GONZALO P. CURIEL
United States District Judge